**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRIGINA**

THOMAS M. JACKSON. JR. ESQ, as

ADMINISTRATOR *of the Estate*

*William S. Ferguson, Deceased*

Under VA CODE 8.01-50, [1]

    *PLAINTIFF,*

  v.        NO: 1:23-cv-00032-JPJ-PMS

SUSAN DOONAN BIELSKI/BLACKWELL,

    DEFENDANT,

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT BLACKWELL'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Plaintiff by counsel, hereby files this response in Opposition to Defendant's Motion to Dismiss for Failure to State a Claim( ECF 37), under Federal Rule of Civil Procedure 12(b)(6) and for lack of subject-matter jurisdiction under Federal Rules of Civil Procedure 12(b)(1), and in support of this opposition avers as follows:

### INTRODUCTION

None of the enumerated grounds on which defendant bases her motion defeats this cause of action and should be denied by the Court. Defendant's use of the verb "show" suggests

---

[1] Thomas M. Jackson, Jr. qualified as Administrator of the Ferguson Estate for the sole purpose of bringing a wrongful death action under Va. Code §8.01-50 before the Clerk of Court in Wythe County, Va. on September 5, 2024. A copy of his Certificate of Qualification is filed as an attachment to this Brief. This filing negates Blackwell's challenge under Rule 12 (b) (2).

that at bottom they are really challenging proof rather than pleading which is not the purpose of bringing a Rule 12 (b) (6) motion. Defendant enumerates specific grounds as a basis for her motion to dismiss.  They are:

1. Failure to "*meet the elements of any tort recognized by Virginia law.*"
2. No "*adequately pled facts that would impose upon Blackwell a duty … as she was not a medical professional.*"
3. Plaintiffs cannot show that Blackwell breached her duty because "*words alone are insufficien*t" without tortious actions.
4. Plaintiffs cannot show that Blackwell's actions "<u>*caused*</u> *Mr. Ferguson's death.*"
5. Allegations state that "*Mr. Ferguson made a conscious decision to end his own life.*"
6. "*Mr. Ferguson's voluntary action still constitutes a superseding-intervening event,*" an illegal one.  *Defendant Blackwell Motion, ECF No. 37.*
   These will be addressed in turn.

## <u>SUMMARY OF MATERIAL FACTS</u>

William Ferguson was married to Joyce Doonan, Blackwell's biological mother for approximately thirty (30) years when she passed away unexpectedly on January 27, 2021. William struggled with severe depression as a result of his wife's death and his own health issues. On or around September 9, 2021, William sought help for and was diagnosed with severe depression. The doctor prescribed an antidepressant and instructed that he go to the Crisis Center. AM ¶ 23-31. [2]

Four days later, on or around September 13, 2021, William suffered a stroke. The doctors at Roanoke hospital told William that because of his carotid artery blockage and kidney issues,

---

[2] AM ¶  ## will refer to the numbered paragraphs in the  First Amended Complaint.

he would not make a good surgical candidate.  Upon hearing this information, he and his daughter Kira Ferguson began making arrangements to seek a second opinion in Philadelphia, Pennsylvania at a highly regarded teaching hospital, the Hospital of  the University of Pennsylvania.  While William began feeling more optimistic pre-surgery, he still struggled with his mental and physical health.  Despite his struggles, he still made plans with his daughter Kira, and his nephew Perry to come to Philadelphia for Treatment.  The plan was that he would leave on October 14, 2021. AM ¶ 32-35.

William's optimistic outlook rekindled his passion for racing.  So much so, that William asked his long-time friend and racing partner, R.K. Dix, to finish modifying his car that he planned to race.  The car was delivered on September 26, 2021. AM ¶ 34-38

Despite this new hopefulness, Mr. Ferguson continued to struggle to cope with the death of his wife and his own health issues.  William's friends noted that he still seemed sad, but he was hopeful and continued to make plans to go to the Hospital of the University of Pennsylvania with his daughter Kira, to receive care and treatment for his carotid artery blockages. AM ¶

Aware of the plans for treatment in Philadelphia, on October 11, 2021, Defendant, Susan Doonan Bielski Blackwell, a stepdaughter came to Virginia from New Hampshire saying she wanted to visit her stepfather, spread her mother's ashes and volunteered she would take care of him and would bring him to the scheduled medical appointment already made in Philadelphia. AM ¶ 38-39.

At that time, Perry was staying with Will and agreed to take Mr. Ferguson to Pennsylvania for his medical appointment. Am. Compl. Notwithstanding those plans, Blackwell said she wanted

3

to visit and said she would assume the duty of Mr. Ferguson's care and transportation for his appointment to Pennsylvania, causing Perry to cancel his plans to do so. Perry left around the time Susan arrived. AM ¶ 40-43

Blackwell spent the next four days assuming the care of Will keeping in contact with Kira foe discussion and advice about how best to care for him. It was during this time Blackwell reinforced Mr. Ferguson's fears that he had nothing to live for. She suggested that he "go be *with Mum*.." and that "*he would die on the table.*" These comments heightened his suicidal ideation. His grief and instability can be seen in an in-home camera system where William is crying at the kitchen table an hour and half before his suicide. AM ¶ 45-63

The Plaintiffs allege that Blackwell actively participated with William in the preparation of his suicide note and helped him spell out the word "arrangements" and assisted him in getting his affairs in order for that demise. And walked him through the event itself by sitting him and even directing the bullet placement. *Id.*

On the morning of October 14, 2021, Defendant took her mother's ashes and began spreading them under a tree on the property where her mother and Mr. Ferguson used to sit. This act on the Defendant's part pushed Mr. Ferguson to a new emotional low. *Id.*

When William mentioned harming himself while sitting on the back deck, Blackwell did not respond with any offer of obtaining medical help, a call to his doctor, family or other attempt to divert, discourage or otherwise prevent him from harming himself. Instead, she directed William not to shoot himself in that location because it would make his removal more difficult by the authorities and ... she thereafter gave additional instructions about where and how to shoot

himself, *"not in the head we want an open casket …not . . . in the house….it will make a mess…"* AM ¶ 50, 52, 58-63, ECF No. 31. Kira Ferguson Affidavit, ECF 34-1 at pg. 2.

William finalized his suicide note and his funeral arrangements. Afterwards, he walked across the room to his cabinet where William retrieved and loaded his pistol. He and Blackwell went outside and sat in plastic chairs placed near the tree where his wife's ashes had just been spread. As he sat there, he asked *"… head or chest…"* Susan said *"…chest…"* Susan waited and watched as William aimed the gun at his chest and pulled the trigger It was over. Susan then walked slowly back into the house. *Id.*

William did not die instantly. Instead of rendering aid, Blackwell began walkin to a neighbor's house. Upon the neighbor's insistence, Blackwell called 911. The neighbor arrived at William's house and applied a towel to stop the bleeding. When the police arrived, Blackwell informed them that William had "planned the whole thing" to die by suicide. AM ¶ 59-64.

Blackwell was well aware of William's extremely fragile physical and emotional state. Text messages between Susan and Kira show that he knew that William was in a fragile emotional state. She knew that he was depressed over losing his wife and his own health ailments, but Blackwell did not take any preventative steps to safeguard his well-being or attempt to save him. Susan was the responsible person for an failing this vulnerable adult. AM ¶ 81-85, 69-71

Blackwell quickly contacted the attorney who wrote Mr. Ferguson's will requesting a "reading of the will" as soon as possible to find out what her share of the Estate would be. The call to the attorney's office was placed approximately two hours after William's death. At her insistence the reading of the will took place the very next day at Susan's insistence. AM ¶ 66-68.

5

Defendant neglected Mr. Ferguson in his fragile emotional, mental, and physical state, and that neglect resulted in his death. Decedent William Ferguson was a vulnerable person due to his physical illness and his severe depression. In this diminished state, Decedent William Ferguson did not have the ability to make reasonable decisions concerning his well-being which substantially impaired his ability to safeguard his person. Defendant took an active role in facilitating Mr. Ferguson's suicide and made no attempt to prevent his death. AM ¶ 60-63.

Defendant had direct and personal knowledge of Mr. Ferguson's mental state and unsound mind but took no steps to contact friends, relatives, or others in order to help avoid his suicide. Defendant participated in Mr. Ferguson's plans to end his life and allowing him to believe that suicide was the only path to ending his depression, his physical and mental anguish. Defendant, his own stepdaughter, who voluntarily took on the role of a caregiver and responsibility for William who was vulnerable both mentally and physically, and he clearly showed a diminished state of mind, had a duty to protect and safeguard Decedent, William Ferguson. Defendant has a special relationship because Mr. Ferguson was her mother's husband and her stepfather. As indicated in her own words, she "loved him as a father." *See Text Message Excerpt attached to Defendant Motion to Dismiss for Lack of Jurisdiction ECF No. 32-1* AM ¶ 45-63.

Defendant oversaw key aspects of Mr. Ferguson's suicide. Blackwell's participation included helping with spelling arrangements while he was writing his suicide note. She also helped will regain his online access to his accounts. *See* Exhibit A. Additionally, Blackwell also gave him specific instructions about where and how to use his gun. *Kira Ferguson Affidavit, p.2*

*[ECF 34-1]*   When Kira  arrived following his death, Blackwell shared these discussions with Kira and Shannon Ferguson and their friends. ECF 34-1 Kira Ferguson Affidavit:

> Susan proceeded to tell me what happened. Susan recounted that my dad was sitting on the back deck and mentioned suicide. Susan then told me and others that were there RK, Christy, April Grubb that she told my dad "not to do it on the back deck  because the medics would not be able to get through the house to get to the back deck to get to you." She then told him "not to shoot himself in the head, because we are not able to have a viewing or open casket funeral." My father then went and sat on the couch in the living room, and then Susan told him "not to do it in the house, because it would be too messy."

> Susan relayed to me that she told him to "go outside and shoot yourself in the chest, not the head." Together, Susan and my dad sat in the chairs outside, and she said my dad pulled the gun pointed and asked her "head or chest" and she said "chest" and my dad pulled the trigger. Susan also said, "go be with mum, you're going to die on the table."  *Id.*

>  . . .

> I spoke with my dad, and he said that Susan insisted on coming to Virginia, to spread her mother's ashes. Susan and my dad planned to leave for Pennsylvania early Friday Morning, October 15, 2021.  *Id.*

Defendant stood to personally profit from this conduct as a beneficiary to the Estate by accelerating the distribution of the Estate.  As illustrated in text messages between Kira and Susan show that she assumed the responsibility to care for and transport William to Philadelphia for his life-saving surgery at a world-renowned hospital in Philadelphia. She placed herself in the position of William's caretaker. Defendant's conduct as a caretaker of William Ferguson was

negligent and demonstrated a complete and total disregard for the wellbeing of Mr. Ferguson such that he suffered an otherwise avoidable death.

But for Defendant's conduct, Mr. Ferguson would have likely continued to live. He definitely had that opportunity. Had Mr. Ferguson survived the gun shot wound he would have had his own claim against Defendant in this matter due to her assumption of duty as caretaker, breaches of that duty, and the directions and assistance given for performing the shooting, a proximate causal connection leading directly to his demise.

## **PLEADING STANDARD**

When ruling on a motion to dismiss, "the material allegations of the complaint are taken as admitted…and "the complaint is to be liberally construed in the favor of plaintiff." *Jenkins v. McKeithen*, 395 U.S. 411, 422 (1969). Such deference is not accorded to any legal conclusions stated therein." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012).

The function of motions to dismiss is to test the law governing the claims, not the facts which support them. *See Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957). Furthermore, all reasonable inferences must be made in favor of the non-moving party, in this case, the plaintiff. See *Johnson v. Mueller*, 415 F.2d 354 (4th Cir. 1969).

A motion to dismiss pursuant to Rule 12(b)(6) must be considered in combination with Rule 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief so as to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Id. (*quoting Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Nevertheless, a

complaint "need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Coleman v. Md. Ct. of Apps.*, 626 F.3d 187, 190 (4th Cir.2010)

To meet the Rule 8 standard and survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). To contain sufficient factual matter to make a claim *plausible*, the factual allegations must "allow [ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

The complaint's factual allegations must do more than create "a sheer possibility that a defendant has acted unlawfully"; the complaint must "plausibly suggest an entitlement to relief." *Metcalf v. Geo Grp.*, 22-6269 (4th Cir. Jun 04, 2024), , *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (internal quotation marks omitted), *SAS Assocs. 1, LLC v. City Council for Chesapeake*, 91 F.4th 715 (4th Cir. 2024).

In this regard, while *a plaintiff is not required to plead facts that constitute a prima facie case in order to survive a motion to dismiss*, *see Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-15, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). *See also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir.2009). *Coleman v. Md. Court of Appeals*, 626 F.3d 187 (4th Cir. 2010). (Emphasis added.)

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.' *Ashcroft v. Iqbal*, 556 U.S. 662,

678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)." (Emphasis added.)*Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023).

A court should only grant a Rule 12(b)(6) motion if, "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable [918 F.3d 318] factual inferences from those facts in the plaintiff's favor, *it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (*quoting Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). (Emphasis added).

In other words plausible: more than speculation, more than sheer possibility, not probability, inferences of actual wrongful conduct, raise entitlement to relief but less than prima facia case will suffice.

The First Amended Complaint here pleads facts sufficient to state a prima facie case, clear duty, specific breaches of duty, injury and preventable death. While the conduct alleged is horrible and antithetical to Virginia law which recognizes the sanctity of life, it is neither speculative nor impossible. The affidavits of Kira and Shannon Ferguson containing admissions of defendant cited hereinabove remain undisputed.

We note here that Plaintiff met the standard of alleging a *prima facie* case as was required to meet the pleading standard under the personal jurisdiction challenge that defendant previously filed under Rule 12 (b)(2). While "I make no finding on the legal sufficiency of the plaintiffs' claims," this Court held: I find that the plaintiffs' Amended Complaint is sufficient to make a prima facie showing that the alleged wrongful act was committed in Virginia by the

defendant." ECF 36 p. 5, 10. Defendant's motion to dismiss asserts no other legal deficiencies sufficient to support a dismissal as demonstrated by the Argument below.

## ARGUMENT

I.      Plaintiffs have alleged facts sufficient to state a  tort claim as well as a cause of action for Wrongful Death.

Defendant Blackwell appears to have correctly outlined the elements of a tort claim under Virginia law as well as elements of a wrongful death claim. Blackwell's Motion to Dismiss, ECF 37, p.5. Defendant however ends that discussion by simply concluding erroneously that "[p]laintiffs cannot establish that Blackwell owed Mr. Ferguson a duty of care, that she breached that duty of care or that her alleged actions caused his death*." Id.*  Defendant then argues  **no "adequately pled facts that would impose upon Blackwell a duty…as she was not a medical professional."** Ultimately and especially for this reason, defendant is wrong.

### A.  Blackwell assumed the duty of care for her stepfather.

A duty of care  may be found under Virginia law under at least two doctrines. 1) She assumed the duty of care. 2) She was his stepdaughter representing that she is visiting him because of that relationship and therefore owes the duty because of the "special relationship." She also has a duty as a reasonable adult to act as a reasonably prudent adult under given circumstances. These include being in proximity to a vulnerable adult.

There is no question that Plaintiff **alleges** facts showing that Blackwell assumed the duty.  Plaintiff pleads in plain language, adequately if not artful, the assumption of duty by Blackwell for her stepfather:

AM ¶ 94 " Defendant Susan Doonan Bielski Blackwell who *assumed the duty to care* for Mr. Ferguson, a vulnerable person."

AM ¶ 96 "Defendant as responsible person to a vulnerable adult and having assumed the duty of care for him, Susan owed Mr. Ferguson a duty of reasonable and appropriate care given her awareness of his ongoing mental anguish and suicidal ideations along with his physical issues.

AM ¶ 83 …placed herself in and assumed the duty of the role of a caregiver and responsible person to a vulnerable person, who clearly had a diminished state of mind, had a duty to protect and safeguard Decedent, William Ferguson.

In *Kellermann v. McDonough*, 278 Va. 478, 684 S.E.2d 786 (2009), our Supreme Court made clear that when a duty of care is assumed the caretaker has a duty to act as a reasonably prudent person. Kellermann claimed that the McDonoughs had a common law duty to supervise and care for Jaimee, a 14-year-old child, left with them temporarily was dependent upon the McDonoughs' care and supervision. The Court agreed with Kellermann that he pled a common law cognizable cause of action in negligence against the McDonoughs. The Court said,

"We hold that when a parent relinquishes the supervision and care of a child to an adult who agrees to supervise and care for that child, the supervising adult must discharge that duty with reasonable care, . . ., the supervising adult must discharge his or her duties as a reasonably prudent person would under similar circumstances." *Id.*

"The issue whether a legal duty in tort exists is a pure question of law,". *Kellermann v. McDonough*, 278 Va. 478, 487, 684 S.E.2d 786, 790 (2009)., *Burns v. Gagnon*, 283 Va. 657, 727 S.E.2d 634, 281 Ed. Law Rep. 729 (2012). Whether a duty has been breached is for the jury.

B. The Court may also find that these particular circumstances were a "special relationship" creating a Duty of Care to William Ferguson due to Defendant's expressed desire to visit with him knowing he was a vulnerable adult both physically and mentally while in Defendant's exclusive care.

Simply put, over a period of four days, Susan appears to have encouraged and watched Mr. Ferguson progressing suicidal condition. Susan's related actions and omissions as his caretaker were breaches of her important duties. These duties flow from the special relationship that was present between stepfather and stepdaughter. They have been in each other's lives for over 30 years. This special relationship was also created by Susan's actions and inactions in the last days of Will Ferguson's life.

Virginia law similarly recognizes that a special relationship can give rise to a duty to take affirmative action to assist or protect another. *See, Schieszler v. Ferrum Coll*. 236 F. Supp. 2d 6602,614 (W.D. Va. 2002) (Kiser, J.) citing *Thompson v. Skate America*, 261 Va. 121, 129, 540 S.E.2d 123, 127 (2001); *Dudas v. Glenwood Golf Club*, 261 Va. 133, 138, 540 S.E.dult2d 129, 132 (2002); *Wright v. Webb*, 234 Va. 527, 530, 362 S.E.2d 919, 922, 4 Va. Law Rep. 1389 (1987).

In *Schieszler,* the court recognized that the Virginia Supreme Court has held that "a special relationship exists as a matter of law between a common carrier and its passengers, an employer and his employees, an innkeeper and his guests and a business owner and his invitees." However, the court also recognized that:

> *"[t]hese are not the only relationships that will give rise to an affirmative duty to assist and protect. The Court also recognizes that a special relationship may exist between plaintiffs and defendants because of particular factual circumstances in a given case."* See Thompson, 261 Va. at 129, 540 S.E.2d at 127 ("Special relationships may exist between particular plaintiffs and defendants, either as a matter of law or because of the particular factual circumstances in a given case.")*; Delk v. Columbia/HCA Healthcare Corp., 259 Va. 125, 132, 523 S.E.2d 826, 830-31 (2000*) (medical facility created de facto special relationship with its patient when it determined that she was in need of constant supervision and surveillance); *Burdette v. Marks,* 244 Va. 309, 312-13, 421 S.E.2d 419, 420-21, 9Va. Law Rep. 273 (1992) (special relationship existed between deputy and passerby which imposed legal duty upon deputy to render assistance to passerby and protect him from attack).

*Schieszler v. Ferrum Coll*. 236 F. Supp. 2d 6602,614 (W.D. Va. 2002) (Kiser, J.) (*Emphasis added).*

In this matter  there is no dispute that the Defendant and  William had a "stepfather-stepdaughter" relationship, which in itself is special.  Her role as his stepdaughter for over 30 years, easily placed her in the role of his care giver and the responsible person for protecting and safeguarding him including from harm to himself.  Blackwell involved herself and became part of the plan to transport William to Pennsylvania.  She was in regular contact with Kira obtaining various instruction such as feeding, clothing, time and place of the meeting up in Pennsylvania, as illustrated in the text messages below:

Mon, Oct 11, 4:22 PM

SUSAN — Made it to Wytheville! Can you give me some pointers on what has worked in taking care of him, do you just walk close to him in case he falls?

SUSAN — I brought a walker with a chair but if he won't use it …

SUSAN — Although i think he will find it useful

Ok just make sure when he stands up he doesn't go any for a minimum of a minute.  I brought him a walker too but not with a chair, that might be better because if he goes down he can't catch himself as he also looses control of his arms.  If he starts falling I try to catch him from the front because he goes forward and I can hold him up better. — KIRA

In *Schieszler,* *"[t]he court also has placed particular emphasis on the "foreseeability of the harm."* (Emphasis added). Under the Court's precedents, the existence of a special relationship will not, standing alone, give rise to a duty; the harm must be foreseeable. citing *Dudas v. Glenwood Golf Club*, 261 Va. 133, 138, 540 S.E.2d 129, 132 (2002) (declining to find inherent in special relationship an absolute duty to protect).

In this matter, there exists a tragic foreseeability. The deeds done and the deeds left undone created a deadly but foreseeable progression. Blackwell had full knowledge of William's fragile condition.

Blackwell alone voluntarily and intentionally assumed the care of her stepfather by assuring Kira and others that she would take care of him and bring him to Philadelphia for his medical appointment.

Blackwell spent four days on the property caring for her stepfather with the plan that she would also drive him to Pennsylvania for medical treatment scheduled by plaintiff Kira Ferguson

who was in Pennsylvania waiting for them.  She recognized his depression and knew of his mental health issues.

She sought guidance for his care by calling or texting with Kira about this general care such as his eating, sleeping, walking, etc.: "give me pointers on… taking care of him", monitoring his food intake "he hasn't eaten all day," and giving at the same time reports to Kira "had nice salad.". and thereby creating a false sense of security.

She  inquired about and was monitoring his sleeping "where do sleep wedges go?" how and what to pack…clothes, medicine, toothbrush," brought walker with chair:" etc.., all the while knowing that her stepfather had age related issues, physical and mental limitations that were significant.

 Right from her first day Susan was aware of Will's the depression  as evidenced  by the video on October 11. The video shows Will  with his head in hands sitting on the couch with dog sitting nearby. Susan responded to his condition at the time by rubbing his back.  Importantly on the morning of his ultimate demise Susan saw Will crying on the kitchen table.

For this argument, defendant ignores Virginia authority regarding assumption of duty and relies on dated authority that does not define current law regarding duty. And, yes, we all owe a duty to behave as reasonably prudent persons in our circumstances. Virginia Model Jury Instruction No. 4.000 defines negligence as "the failure to use ordinary care." "Ordinary care is the care a reasonable person would have used under the circumstances of the case." A reasonable person under these circumstances would have reached out for help **before** William shot himself.

Ultimately defendant places her entire "no duty" argument in the single basket that Blackwell had no duty, and could not assume a duty, and has no liability **because she is not a "medical professional"!** Along the way Blackwell states that plaintiff contends there is a duty "because she is a lawyer." Not so. But a lawyer should behave as a reasonably prudent person under any circumstances. This conclusion under these circumstances can hardly compare to Mr. Ferguson's "suicide" and the inapposite authority regarding hospitalization decisions. Blackwell cannot escape a jury's assessment of whether she acted as a reasonably prudent person by claiming she is not a medical professional. She cannot escape from the duty of every person to exercise ordinary care. This argument does not support defendant's argument that there was no duty.

Had Mr. Ferguson survived, he would have had his own claim against Defendant in this matter due to the assumption of duty as caretaker, breaches of that duty, and the directions and assistance given for performing the shooting, a proximate causal connection leading directly to his demise.

## II.  Blackwell Breached Her Duty of Care for her Stepfather

Defendant contends that Blackwell assisted her stepfather by making an inventory of his estate and "pre-surgery arrangements" while they were there together before he walked to the yard and the shot was fired. Blackwell does not address the amended complaint's alleged breaches of her duty for failure to seek intervention for him before the gun shot or assist her

father following the gun shot. The defense merely concludes plaintiffs cannot show that Blackwell breached her duty because "words alone are insufficient to rise to the level of breach.."

ECF 37 p.6.

At a critical a critical point Ferguson's dark leanings and emotional weakness turned very dark and he talked more specifically and openly about suicide to Susan. It is at that point that Susan, as an informed and in control caretaker fully relinquished her duty to her charge, her stepfather. It is also then that she actively orchestrated the final events of Will Ferguson's life. These failures include failure to remove the gun from his possession, failure to seek treatment for him when he mentioned suicide, failure to take him to get help, failure to contact his biological daughters (Kira, medical power of attorney) for instruction.

Instead, Susan engaged in discussions that enhanced his depression, " you will die on the table", "go be with mum", etc. Contrary to defendant's view we believe "speaking" is an "action." and can be the sole basis for liability.

As Mr. Ferguson was actively contemplating immediate end to his life, Blackwell shared with her stepsisters that she said, "no don't do that in here…it would be a mess…go outside " She ultimately placed two chairs near the tree where they had spread Blackwell's mother's ashes that day. She sat beside him and gave additional instructions "CHEST' as described in the Affidavits of Kira Ferguson and Shannon Ferguson. Mr. Ferguson shot himself as directed.

Blackwell's acts and omissions then become the ultimate cause of his death. She calls no one. She watches him bleeding from the chest wound without seeking immediate medical supplies and hears him in his pain. She then walks toward a neighbor's house to share the story.

911 is called .The neighbor then rushes to the house to try to stop Mr. Ferguson's bleeding. He tried but could not. Ferguson dies.

Susan calls the lawyer who drafted Ferguson's will and asks for an immediate reading to see what she is going to get. The will is read the very next day.

The breaches identified above and cited to the Amended Complaint include numerous actions and omissions by Blackwell that are not merely words. Defendant uses the actions versus words distinction in an attempt to remove Blackwell's conduct from the coverage of Va Code § 8.01-622.1, failing to consider that Blackwell's instructions and directions to Mr. Ferguson regarding how and where he should shoot himself.

It is also difficult to conclude that in this context words like, "*go be with mum" and "you will die on the table*" in combination with "shoot yourself outside" "shoot yourself in the chest" not the head" are constitutionally protected when uttered to the mentally distraught Mr. Ferguson.

Nonetheless, the Amended Complaint adequately states a claim. This argument also ignores all post-shooting conduct of neglect and failure to seek assistance both **before** and **after** the shooting.

This Amended Complaint states a common law negligence claim under Virginia Law for Blackwell's egregious participation.

III.    Plaintiffs Plead Sufficient Causation Facts  under Virginia Law

Defendant argues that Plaintiffs "cannot *show* that Blackwell's actions caused Mr. Ferguson's death." This argument goes to plaintiff's proof, not sufficiency of the pleading and should not be noticed on this motion.

Defendant also presumes the plaintiff's causation burden incorrectly. Plaintiffs' burden in this case is not to prove Blackwell's conduct was *the* proximate cause of Mr. Ferguson's death. Plaintiff's burden is to show that her conduct was *a* proximate cause of his death.

In Virginia, an injury is proximately caused by a defendant's negligence if the injury is the natural and probable consequence of the negligence. Wyatt v. Chesapeake & Potomac Tel. Co., 158 Va. 470, 476, 163 S.E. 370 (1932). The natural and probable consequences are those which human foresight can foresee. Id. at 479, 163 S.E. 370. However, there may be more than one proximate cause for an event. Jenkins v. Payne, 251 Va. 122, 465 S.E.2d 795, 799 (1996); Etheridge v. Norfolk So. R. Co., 143 Va. 789, 129 S.E. 680, 683 (1925).Schieszler v. Ferrum College, 236 F.Supp.2d 602 (W.D. Va. 2002)

`The proximate cause of an event is that act or omission which, in natural and continuing sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred.' *Beale v. Jones*, 210 Va. 519, 522, 171 S.E.2d 851, 853 (1970). There may be more than one proximate cause of an event. *Panousos v. Allen*, 245 Va. 60, 65, 425 S.E.2d 496, 499 (1993). *Atkinson v. Scheer*, 256 Va. 448, 508 S.E.2d 68 (1998)

The amended complaint alleges her conduct and causal relationship to his death. AM ¶¶ 94, 97, 98, 99.

**IV.     Mr. Ferguson did not commit an illegal act of suicide.**

Plaintiff plainly alleges William was of unsound mind. The Illegal Doctrine Act under Virginia law: the Virginia Supreme Court has held that if the illegal act in question is the victim's suicide, and the suicide was the result of the victim being of unsound mind at the time of his death, the defense of illegality will not bar recovery for wrongful death. See *Molchon v. Tyler*, 262 Va. 175, 181, 546 S.E.2d 691 (2001); *Wackwitz v. Roy,* 244 Va. 60, 65-66, 418 S.E.2d 861 (1992).

In *Molchon*, a personal representative sued his decedent's psychiatrist who had released the decedent from hospital care after diagnosing him with acute depression and suicidal tendencies; the decedent thereafter committed suicide. *Molchon v. Tyler,* 262 Va. 175, 181, 546 S.E.2d 691 (2001). The Virginia Supreme Court concluded that the personal representative could bring a wrongful death action against the psychiatrist. Id. In her Amended Complaint, Schieszler alleges that Frentzel *"was not of sound mind at the time he took his own life."*

In support of this legal conclusion, she alleges that Ferrum required Michael to enter counseling as a condition of his continued enrollment and that he had threatened suicide and physically injured himself in the days before his death. I find that the plaintiff has sufficiently alleged that Frentzel was of unsound

mind at the time of his death.  Thus, the fact that Frentzel's death was caused by suicide will not bar recovery for wrongful death at this stage of the proceedings.  (Emphasis added.) *Schieszler v. Ferrum College*, 236 F.Supp.2d 602 (W.D. Va. 2002)

Defendant argues that  plaintiff alleges that "Mr. Ferguson made a conscious decision to end his own life." This statement is not true. The word "conscious" does not appear in the Amended Complaint.  On three occasions the phrase "shot himself" is used to describe the event. AM.  ¶¶ 73, 56, 59. Nothing is alleged by plaintiff that he understood what he was doing or had capacity to do it willfully or autonomously with full senses. In fact, it is alleged that " [I]n this diminished state, Decedent William Ferguson did not have the ability to make reasonable decisions concerning his well-being which substantially impaired his ability to safeguard his person."  AM ¶71

Defendant alleges that "Mr. Ferguson's voluntary actions still constitute a superseding-intervening event, an illegal one" thereby relieving her of any liability. That is wrong.

Supervening and Intervening cause theory does not apply where, as here, the defendant, Blackwell assisted in the events occurring prior to the shooting and the shooting was not a completely  "new effective cause" of the death.

"In order to relieve a defendant of liability for his negligent act, the negligence intervening between the defendant's negligent act and the injury must so entirely supersede the operation of the defendant's negligence that it alone, without any contributing negligence by the defendant in the slightest degree, causes the injury. Id.; *Coleman v. Blankenship Oil Corp.*, 221 Va. 124, 131,

22

267 S.E.2d 143, 147 (1980); *City of Richmond v. Gay*, 103 Va. 320, 324, 49 S.E. 482, 483 (1905). Thus, a superseding cause of an injury `constitutes a new effective cause and operates independently of any other act, making it and it only the proximate cause of injury.' *Maroulis v. Elliott,* 207 Va. 503, 511, 151 S.E.2d 339, 345 (1966)." (Emphasis added). Jenkins, 251 Va. at 128-29, 465 S.E.2d at 799. *Atkinson v. Scheer*, 256 Va. 448, 508 S.E.2d 68, 71-72 (1998).

"*To be a superseding cause, whether intelligent or not, it must so entirely supersede the operation of the defendant's negligence, that it alone, without the defendant's contributing negligence thereto in the slightest degree, produces the injury*." (Emphasis added.) *Panousos* v. *Allen,* 245 Va. 60, 64-65, 425 S.E.2d 496, 499 (1993); Philip Morris, Inc. v. Emerson, 235 Va. 380, 397, 368 S.E.2d 268, 277 (1988); *Cox v. Mabe,* 214 Va. 705, 708, 204 S.E.2d 253, 256 (1974); *Savage Truck Line v. Traylor*, 193 Va. 579, 585-86, 69 S.E.2d 478, 482 (1952); *Jefferson Hospital* v. *Van Lear*, 186 Va. 74, 81, 41 S.E.2d 441, 444 (1947). *Atkinson v. Scheer*, 256 Va. 448, 508 S.E.2d 68 (1998)

Suicide can be a superseding/intervening cause **unless** deceased was of unsound mind. Mr. Ferguson was of unsound mind, severely depressed and receiving medical treatment as alleged in the First Amended Complaint.

## CONCLUSION

Defendant Blackwell has failed to identify any deficiency in pleading or law that would justify the Court's grant of the Motion to Dismiss for failure to state a claim under FRCP 12(b)(6). Plaintiff respectfully requests that the Motion be denied. **PLAINTIFF   BY COUNSEL**

/s/ Mary Lynn Tate

Mary Lynn Tate, Esq. (VSB # 16085) Tate Law PC

P.O. Box 807

211 W. Main St. Abingdon, VA 24212

Phone: (276) 628-5185

Fax: (276) 628-5045

Email: mltate@tatelaw.com


Gerard K. Schrom, Esquire Schrom, Shaffer & Botel, P.C. 4 West Front Street

Media, PA 19063

Phone: (610) 565-5050

Fax: (610) 565-2980

Email: gschrom@schromandshaffer.com Co-Counsel for Plaintiffs

## Certificate of Service

I hereby certify that on this 13th day of September, 2024, a copy of the foregoing PLAINTIFFS' OPPOSITION TO DEFENDANT BLACKWELL'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM was filed ECF, sent via electronic mail for filing and service on counsel for Defendant.

/s/ Mary Lynn Tate


Kathleen McCauley, Esquire (VSB # 39028)

Stewart R. Pollock, Esquire (VSB # 92466)

MORAN REEVES & CONN PC

1211 E. Cary Street Richmond, Virginia 23219 Telephone: (804) 864-4832

kmccauley@moranreevesconn.com spollock@moranreevesconn.com

Counsel for Susan Doonan Blackwell, a/k/a Susan Doonan Bielski